# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHERRY KILGORE | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case No. 08-0974 |
|  | ) |
| HILL PARTNERS | ) |
| CORPORATION, INC., | ) |
| et al. | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## DEFENDANT UNITED STATES' MOTION TO DISMISS THE AMENDED COMPLAINT

Defendant United States respectfully moves to dismiss Plaintiff's Amended Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). In support of this motion, Defendant respectfully refers the Court to the attached memorandum of points and authorities.

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
BLANCHE L. BRUCE, D.C. BAR # 960245
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-6078

Of Counsel:
Timothy Tozer
U. S. General Services Administration

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHERRY KILGORE        ) | |
|              ) | |
|        **Plaintiff,** ) | |
|              ) | |
|     **v.**       ) | **Case No. 08-0974** |
|              ) | |
| HILL PARTNERS       ) | |
| CORPORATION, INC.,    ) | |
|      **et al.**     ) | |
|              ) | |
|       **Defendants.** ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS

Plaintiff alleges that ice and snow on the steps outside of the Old Post Office Pavilion ("Old Post Office") in Washington, DC caused her to slip and fall to the ground. *Amended Complaint* at ¶¶ 7-8. According to Plaintiff, she sustained injuries as a result of Defendant's negligence in failing to properly inspect and maintain the premises. *Amended Complaint* at ¶¶ 10-11. As a result, Plaintiff seeks compensatory damages in the amount of $500,000, along with interest and costs.

As set forth below, Plaintiff's Federal Tort Claims Act (FTCA) claims against the United States are barred by the statute of limitations and the independent contractor exception. Hence,

the Amended Complaint against the United States[1] should be dismissed for lack of subject matter

jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## I.    Legal Standard

"Federal courts are courts of limited jurisdiction.  They possess only that power

authorized by Constitution and statute . . . which is not to be expanded by judicial decree. . . . It

is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of

establishing the contrary rests upon the party asserting jurisdiction."  Kokkonen v. Guardian Life

Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted).  To meet that jurisdictional

burden, a plaintiff must establish "by a preponderance of the evidence that the court possesses

[subject matter] jurisdiction." Malewicz v. City of Amsterdam, 362 F.Supp.2d 298, 305 (D.D.C.

2005).  A court resolving a motion to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1) is not limited to the allegations set forth in the complaint.  Id.  Rather, a court may also

consider relevant material outside of the pleadings.  Id.

In resolving a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court will

treat the complaint's factual allegations as true and draw all reasonable inferences therefrom in

the plaintiff's favor.  Sullivan-Obst v. Powell, Sec'y, Dep't of State, 300 F.Supp.2d 85, 91

(D.D.C. 2004).  However, while Fed. R. Civ. P. 8(a)(2) requires only "a short and plain

---

[1]    Plaintiff's Amended Complaint lists two federal defendants, the United States of America
and "its General Services Administration (GSA)." (Docket Entry 1, Attachment 1).  However,
the United States is the only proper federal defendant in a FTCA action, and not the particular
federal agency.  The GSA therefore should be dismissed as a named Defendant.  28 U.S. C. §
2679(a); Hall v. Administrative Office of the United States Courts, et al, 496 F. Supp. 2d 203
(D.D.C. 2007) (citing Cox v. Secretary of Labor, 739 F. Supp. 28, 29 (D.D.C. 1990) (suit against
the Secretary of Labor rather than the government itself must be dismissed for lack of subject
matter jurisdiction)).

statement of the claim showing that the pleader is entitled to relief," a mere conclusory assertion of entitlement to relief is not sufficient. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  The complaint must appear plausible on its face and raise a reasonable expectation that discovery will produce supporting evidence. Id. at 1965.

## II.    Plaintiff's Claims are barred by the Statute of Limitations

A condition to a waiver of sovereign immunity under the FTCA is the timely presentation of a claim to the appropriate federal agency.  See United States v. Kubrick, 444 U.S. 111, 117 (1979).  In relevant part, the FTCA states:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, or notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).  See also 28 U.S.C. § 2675(a); Hall v. Admin. Office of the United States Courts, et al., 496 F. Supp.2d 203, 206 (D.D.C. 2007).  As set forth below, Plaintiff failed to satisfy this jurisdictional requirement.

On November 7, 2005, GSA received Plaintiff's administrative tort claim.  See Exhibit 1. By certified letter dated March 17, 2006, Sharon A. Roach, Esq., GSA Regional Counsel, denied the claim and specifically informed Plaintiff that,

> If you disagree with this determination and wish to pursue the matter further, you must file suit in the appropriate United States District Court within six months of the date of this letter.

See Exhibit 2.  Rather than initiating suit against the United States within six months in District Court, Plaintiff filed a complaint in the Superior Court of the District of Columbia on November

3

8, 2007, more than a year and one-half, after the date on Ms. Roach's letter.  See Exhibit 3.
Moreover, the Superior Court complaint did not even name the United States as a Defendant. Id.
On May 7, 2008, well over two years after Ms. Roach's letter, Plaintiff filed the instant amended
complaint naming the United States as a party to the civil action in state court, and not federal
court.  On June 6, 2008, the United States removed the civil action to this Court.  See Docket
Entry 1.

The evidence overwhelmingly shows that Plaintiff failed to comply with the time
requirements specified in 28 U.S.C. § 2401(b) and, accordingly, the Complaint should be
dismissed against the United States for lack of subject matter jurisdiction.

### III.    Should this Court Find that Plaintiff Timely Filed the Complaint, the Suit is barred by the Independent Contractor Exception

Sovereign immunity bars all suits against the United States except in accordance with the
explicit terms of a statutory waiver of such immunity.  United States v. Nordic Village, Inc., 503
U.S. 30, 32-34 (1990) ("[w]aivers of the Government's sovereign immunity, to be effective, must
be 'unequivocally expressed'") (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95
(1990)).  A waiver of sovereign immunity must be strictly construed in favor of the United
States.  Ardestani v. INS, 502 U.S. 129, 137 (1991) (citing Library of Congress v. Shaw, 478
U.S. 310, 318 (1986); Ruckelshaus v. Sierra Club, 463 U.S. 680, 685 (1986)).

The FTCA established a narrow waiver of the government's immunity from suit in tort by
limiting the government's liability to torts committed by "employee(s) of the Government" while
acting within the scope of their employment.  28 U.S.C. § 1346(b)(1).  The leading cases on
whether an individual is an "employee of the Government" are Logue v. United States, 412 U.S.

4

521 (1973) and <u>United States v. Orleans</u>, 425 U.S. 807 (1976).  The Supreme Court's holdings in

<u>Logue</u> and <u>Orleans</u> turned, in large part, on the right of the United States "to control the detailed

physical performance of the contractor," <u>Logue</u>, 412 U.S. at 528, and on "whether [the

contractor's] day-to-day operations are supervised by the Federal government."  <u>Orleans</u>, 425

U.S. at 815.   Allegations that a contractor is required to comply with detailed regulations,

specifications or standards in performing the work do not establish that the United States

supervised the contractor's day-to-day operations or controlled the detailed physical performance

of the contractor's work, and do not, standing alone, vitiate the contractor exclusion.  <u>Logue</u>, 412

U.S. at 529-530; <u>Orleans</u>, 425 U.S. at 817-18; <u>Macharia v. United States</u>, 334 F.3d 61 (D.C. Cir.

2003).  Absent a showing of day-to-day supervision or a right of control, the United States is not

liable for the torts committed by the contractor or its employees.

In the present case, the Plaintiff's complaint centers around the presence of ice and snow

on the steps of the Old Post Office and the United States' purported negligence in not removing

the dangerous condition within a reasonable time.  *Amended Complaint* at ¶¶ 12-13.  While the

United States admits that it owns the Old Post Office, a Property Management Agreement

("PMA") between Hill Partners, Inc. ("Hill Parters") and GSA clearly establishes Hill Partners as

an independent contractor that is responsible for providing snow removal services.  <u>See</u> Exhibit

4.

In particular, the Recitals section of the PMA indicates that, "Owner desires to have

available to it the real estate management services of the Manager as a common law independent

contractor."  <u>Id</u>. Furthermore, the PMA states that "Manager shall not be an agent or employee of

Owner . . ."  <u>Id</u>. at ¶ 1.  In discussing Hill Partners' employees, the PMA states that, "Since this

Agreement is not one of agency by Manager for Owner but one with Manager engaged independently in the business of managing properties on its own behalf, all employment arrangements are therefore solely Manager's concern . . ." Id. at ¶ 4(k).  Finally, the PMA states that, "Notwithstanding anything to the contrary, which may be contained herein, Manager is and shall be construed for all purposes as an independent contractor and not as an employee of Owner." Id. at ¶ 13.

Additionally, Paragraph 4(h) of the PMA requires Hill Partners to provide certain "Customary Services," including snow removal.  Moreover, as part of its "Management Functions," Hill Partners is required to"[s]upervise the persons or entities providing Customary Services pursuant to Paragraph 4(h) hereto." See id. at ¶ 4(f)(iv).  Thus, the PMA requires Hill Partners to provide snow removal services and to supervise those personnel.  See Cooper v. United States, 225 F. Supp. 2d 1, 4 (D.D.C. 2002) ("When the United States delegates a responsibility to an independent contractor, it is not responsible in tort for the independent contractor's negligent performance of that responsibility.").  As a result, the United States should be dismissed as a defendant in this civil case because one, Hill Partners, the United States' independent contractor was responsible for snow removal, and two, no federal government employee was involved in any alleged negligence regarding the snow removal.

IV.    **CONCLUSION**

For the above-stated reasons, the Amended Complaint against the United States should be dismissed with prejudice.

Respectfully submitted,

/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

/s/_____
BLANCHE L. BRUCE , D.C. BAR # 960245
Assistant United States Attorney
555 Fourth Street, N.W., Room E-4417
Washington, D.C. 20530


Of Counsel
Timothy Tozer
U. S. General Services Administration

7



# KEITH WATTERS & ASSOCIATES

ATTORNEYS AT LAW

1717 K STREET, N.W.

SUITE 1112

WASHINGTON, D.C. 20036

─────────

202-887-1990

FACSIMILE 202-293-2368

KEITH W. WATTERS (D.C., MD. & N.Y.)

OF COUNSEL
BYNUM & JENKINS, PLLC (VA.)

901 NORTH PITT STREET
SUITE 320
ALEXANDRIA, VIRGINIA 22314

July 26, 2005

GSA / NCr/ WL
Attn: ~~Wanda Alston~~  *Paula Demuth*
301 7th. Street, S.W.
Suite 7048
Washington, D.C. 20407

Ref: Sherry Kilgore
D/A: 2/26/05

Dear Ms. Alston:

This office has been retained to represent Ms. Kilgore for injuries sustained after she slipped and fell on to icy, slipper, snowy steps located at the old post office building on Pennsylvania Avenue, N.W. Washington, D.C.

Enclosed, please find the completed tort claim for damages, injury and death form, along with the most recent medical reports and bills for your file. We would appreciate an acknowledgment letter for our file. Your prompt and immediate attention is appreciated.

Sincerely,
WATTERS & ASSOCIATES

By:  Deborah Colbert-Vidal
     Legal Assistant

OFFICE OF
REGIONAL COUNSEL
2005 NOV -7 PM 3: 10
GSA NCR WL

# CLAIM FOR DAMAGE, INJURY, OR DEATH

**INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions.

FORM APPROVED
OMB NO.
1105-0008
EXPIRES 3-31-91

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. *(See instructions on reverse.)* *(Number, street, city, State and Zip Code)* |
|---|---|
| GSA / NCR / WL Attn: Wanda Alston Paula Demith 301 7th. St., S.W. #7048 Washington D.C. 20407 | Sherry Kilgore 4715 66th Place Hyattsville, Md. 20784 Keith Watts, Attorney |

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH 4/23/52 | 5. MARITAL STATUS Divorced | 6. DATE AND DAY OF ACCIDENT 2/26/5 | 7. TIME (A.M. OR P.M.) 2:00 P.m. |
|---|---|---|---|---|

8. Basis of Claim *(State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurence and the cause thereof) (Use additional pages if necessary.)*

At the location of the U.S. Old Post Office on Pennsylvania Ave. Washington D.C. I attempted to walk on steps located here. But because of icey, snowey, slippery conditions of the steps, I fell and injured my foot, leg + knee. I was taken to Howard Univ. Hospital- Treated + released

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT *(Number, street, city, State, and Zip Code)*

N / A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. *(See instructions on reverse side.)*

N / A

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

sprain / strain foot, leg, + knee

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS *(Number, street, city, State, and Zip Code)* | |
| | | |

| 12. *(See instructions on reverse)* | AMOUNT OF CLAIM *(in dollars)* | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL *(Failure to specify may cause forfeiture of your rights.)* |
| | $ 200,000 | N/A | $ 200,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT *(See instructions on reverse side.)* | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| X Sherry D. Kilgore | 3?-773-7332 | |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. *(See 31 U.S.C. 3729.)* | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. *(See 18 U.S.C. 287, 1001.)* |

95-108
Previous editions not usable.

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2



### PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

### INSTRUCTIONS

#### Complete all items - Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden,

to Director, Torts Branch
Civil Division
U.S. Department of Justice
Washington, DC  20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC  20503

### INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

**15. Do you carry accident insurance?**  ☐ Yes, If yes, give name and address of insurance company (*Number, street, city, State, and Zip Code*) and policy number.  ☐ No

N/A

**16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?**

None

**17. If deductible, state amount**

**18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim?** (*It is necessary that you ascertain these facts*)

None

**19. Do you carry public liability and property damage insurance?**  ☐ Yes, If yes, give name and address of insurance carrier (*Number, street, city, State, and Zip Code*)  ☐ No

None



GSA National Capital Region

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

**March 17, 2006**

**Keith W. Watters, Esquire**
**1717 K Street, NW**
**Suite 1112**
**Washington, DC 20036**

**Re:    Claim of Sherry Kilgore, WL-T05-40**

**Dear Mr. Watters:**

**This responds to your claim in the amount of $200,000.00 for personal injury to your client, Sherry Kilgore. She alleges that on February 26, 2005, she fell while walking on steps located at the Old Post Office Building on Pennsylvania Avenue, in Washington, D.C. For the reason discussed below, I am denying your claim.**

**You filed this claim under the Federal Tort Claims Act. The Federal Tort Claims Act, 28 U.S.C. § 2672, provides for the settlement of claims "caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." There is no evidence that any employee of the General Services Administration was negligent.**

**Customary services, including any required snow removal at the Old Post Office Building, are provided by a Property Manager, an independent contractor. The Federal government is not responsible for acts or omissions of its contractors. The Property Manager is:**

**Hill Partner Corporation**
**1100 Pennsylvania Avenue, NW**
**Washington, D.C. 20004**

U.S. General Services Administration
301 7th Street, SW
Washington, DC  20407-0001
www.gsa.gov

If you disagree with this determination and wish to pursue the matter further, you must file suit in the appropriate United States District Court within six months of the date of this letter.

Sincerely,

Sharon A. Roach
Regional Counsel

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☑ Agent  ☐ Addressee

B. Received by ( *Printed Name* )   C. Date of Delivery

_F. President_   9/21/06

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Keith W. Watters, Esq
1717 K Street, NW
Suite 1112
Washington, DC 20036

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
   *(Transfer from service label)*   7003 3110 0003 4109 2842

PS Form **3811**, August 2001      Domestic Return Receipt      102595-02-M-1540

...s to your clai...
...our client, Sherry...
...le walking on steps loca...
...a Avenue, in Washington, D...
...nying your claim.

...n under the Federal Tort Claim...
...C. § 2672, provides for the settle...
...ongful act or omission of any emp...
...scope of his office or employment...
...United States, if a private person...
...ce with the law of the place where the...
...e no evidence that any employee of the...
...n was negligent.

...required snow removal at the Old Post...
...operty Manager, an independent...
...s not responsible for acts or...
...ty Manager is:

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

SHERRY KILGORE                    *
4715 66 Place                     *
Hyattsville, MD  20784            *
                                  *
     Plaintiff,                   *                    
                                  *
     vs.                          *     Civil Action No.: _____
                                  *
HILL PARTNER CORPORATION          *
101 W. Worthington Avenue         *
Charlotte, N.C.  28203            *
                                  *
     and                          *
                                  *
ABM JANITORIAL SERVICES           *
1400 New York Avenue, NW          *
Washington, DC  20005             *
                                  *
     Defendants.                  *

COMPLAINT

(NEGLIGENCE)

COMES NOW the Plaintiff, Sherry Kilgore, by and through her
attorneys, Keith W. Watters and Associates, and hereby moves for
judgment against the Defendants, Hill Partner Corporation and ABM
Janitorial Services, on the grounds and in the amount as
hereinafter set forth:

1.    This Court has jurisdiction pursuant to Title 11, Section
921 of the Code of the District of Columbia (1981 ed., as amended).

2.    Plaintiff, Sherry Kilgore, (hereinafter referred to as
("Plaintiff") was at all times relevant herein a resident of the
State of Maryland.



1

# PROPERTY MANAGEMENT AGREEMENT

## TABLE OF CONTENTS

### Section

1. APPOINTMENT

2. TERM

3. MANAGEMENT FEE

4. MANAGEMENT SERVICES

   (a) Rental Payments, Determination of Rent
       Increases and Escalation Charges
   (b) Records
   (c) Monthly Reports
   (d) Other Reports
   (e) Operating Budget
   (f) Management Functions
   (g) Repairs and Maintenance
   (h) Customary Services
   (i) Insurance
   (j) Government Rules
   (k) Employees
   (l) Rules and Regulations
   (m) Hiring Attorneys
   (n) Taxes and Assessments
   (o) Operating Account
   (p) Authorized Expenditures Reimbursement
   (q) Other Services
   (r) Lease Renewals and Expansions
   (s) Confidentiality

5. INDEMNIFICATION

6. AMENDMENTS

7. NOTICES AND CONSENTS

8. NONASSIGNABILITY

9. APPLICABLE LAW

10. ATTORNEYS' FEES

11. WAIVER

12. COMPETITION

13. STATUS OF MANAGER

14. ENTIRE AGREEMENT

15. BINDING EFFECT

16. COUNTERPARTS

17. SEVERANCE

18. LIMITATION OF LIABILITY

19. OFFICE ON THE PROPERTY

20. NO DISCRIMINATION

propmanual1.wpd

05-13-94 02:40PM P006 #21

303 741 0867

R-96%

05-13-94 02:40PM P007 #21

## TABLE OF CONTENTS (continued)

### EXHIBITS

A. Reports Due as of 10th of the Month

B. Other Reports

C. Commission Schedule

D. Hold Harmless

### SCHEDULES

A. Cash Receipts

B. Bank Reconciliation

C. Tenant Rent Roll

D. Tenant Delinquency Report

E. Tenant Prepaid Report

F. Tenant Billback Report

G. Cash Disbursements

H. Schedule of Compensation for Reimbursable Employees

I. Subsidiaries and Affiliates

05-13-1994 12:47    303 741 0867    WELLS FARGO    303 741 0867    P.07    R-96%

ppf/consult1.wpd

# PROPERTY MANAGEMENT AGREEMENT

This Property Management Agreement is entered into as of May 13, 1994 between Collin Equities, Inc., a Texas corporation ("Owner") and Hill Partners, Inc. ("Manager").

## RECITALS

A. Owner owns that certain property described as a two-phased urban retail center, totalling approximately 101,018 square feet of net rentable area, (of which Phase I totals approximately 49,363 square feet of net rentable area and Phase II totals approximately 51,655 square feet of net rentable area) located at 1100 Pennsylvania Avenue, N.W. in Washington, D.C. and is commonly known as The Pavilion at the Old Post Office (the "Property").

B. Manager is in the business of managing properties for owners thereof and is willing to render such services to Owner with respect to the Property.

C. Owner desires to have available to it the real estate management services of the Manager as a common law independent contractor.

## AGREEMENT

NOW THEREFORE, in consideration of their mutual undertakings, Owner and Manager agree as follows:

1. **APPOINTMENT.** Owner hereby appoints Manager and Manager hereby accepts appointment on the terms and conditions hereinafter provided as an independent contractor within the meaning of Reg. §1.856-4 of the Federal Income Tax Regulations, with exclusive authority to operate and manage the Property. Manager shall not be an agent or employee of Owner except that Manager shall be Owner's agent for the sole purpose of collecting rents from the Property. Manager represents and warrants that it has the full right, power and authority, including any required licenses or permits, to enter into this Agreement and to perform the services required as provided for herein, and upon the conditions and for the term and compensation set forth herein.

2. **TERM.**

(a) This Agreement shall commence as of ~~June 15~~, 1994; and shall continue monthly thereafter. Notwithstanding the foregoing, Owner or Manager may terminate this Agreement without cause on thirty (30) days written notice, ~~or at Owner's option, Owner may terminate this Agreement without cause on not less than~~ five (5) days notice provided that: (i) Owner agrees to pay Manager a termination fee equal to the Management Fee paid to Manager for the last full calendar month of the term of this Agreement, and (ii) Owner agrees to pay Manager a sum equal to the compensation paid to Manager for the last full calendar month of the term of this Agreement pursuant to paragraph 4(k) hereof. Any notice delivered by Owner to Manager pursuant to this provision shall designate a specific date (the "Termination Date") upon which the Agreement shall terminate. In addition, in the event of a sale, exchange or transfer of the Property, or the termination of Owner's interest therein, Owner may terminate this Agreement by written notice to Manager, effective as of the date of such sale, exchange, transfer or termination.

(b) No later than the Termination Date, Manager shall immediately deliver to Owner or Owner's designee: (i) all of the records in the possession of Manager and any personal property in Manager's possession or control belonging to Owner, or pertaining to the Property; (ii) any funds of any tenant or Owner including, without limitation, Security Deposits; (iii) any written lease, tenancy, occupancy agreement or rental agreement, for the rent or lease of space in the Property (collectively referred to herein as

*[handwritten annotations in margin: "June 15", "$5,000", "$20,000"]*

"Tenant Leases"), receipts for deposits, insurance policies or unpaid bills which pertain to the Property; (iv) keys, garage cards, and parking permits and passes; and (v) any other documents (including, without limitation, notes of conversations with tenants or others), proposals, service agreements, construction bid documents, etc.), Property or items relating to the Property in its possession or control. For each day after the Termination Date of this Agreement that Manager fails to turn over the documents listed above to Owner or Owner's designee, Manager shall pay Owner a penalty equal to the Management Fee payable for the last full calendar month of this Agreement divided by thirty (30).

(c) Any rent checks or other funds, invoices or anything referred to in paragraph (b) above received by Manager after the Termination Date shall be delivered immediately upon receipt by Manager to Owner or Owner's designee.

(d) Manager's obligations under this Agreement, except as specifically provided herein, shall cease upon the Termination Date except for the obligation to provide the last monthly report as prescribed in paragraph 4(c) hereof for the last month (or part thereof) of operation and the reconciliation as of the Termination Date of any compensation due Manager pursuant to paragraph 3 hereof.

(e) The rights of termination specifically provided herein shall be considered to be cumulative, and shall be in addition to the rights of termination of this Agreement, inuring to the parties by operation of law, or otherwise.

## 3.  MANAGEMENT FEE.

(a) As compensation for Manager's services to the Property, Owner shall pay Manager the greater of: (i) Twelve Thousand Five Hundred Dollars ($12,500) monthly; or, (ii) four percent (4%) of the basic or minimum rents collected by Manager during the immediately preceding month and received by Owner from Tenant Leases, including percentage or additional rentals, reimbursements for real estate taxes, insurance premiums and operating expenses; excluding, however, promotional fund income, local rental taxes, any monies recovered from insurance claims, refundable security deposits, proceeds from loans or sale of the Property, and returned checks (the "Management Fee"). The Management Fee shall be prorated for any partial month during the term hereof by dividing the previous month's Management Fee by 30 and multiplying by the number of days services were provided by Manager prior to the date any additional fees for services within or outside of the scope of this Agreement unless agreed to Manager in writing by Owner prior to Manager performing such services. Manager is hereby authorized to pay itself the Management Fee on the first day of each calendar month during the term of this Agreement out of the Operating Account (as defined in paragraph 4.(o).

(b) Upon termination of this Agreement under the provisions specified in paragraph 2 above, Manager shall be entitled to any compensation or reimbursement which is due Manager for any approved expenditures made or approved services performed on or before the time of such termination. Manager's right to compensation hereunder shall immediately cease upon termination, and neither party shall have any rights, duties or obligations hereunder, except such duties specified herein as surviving the termination hereof. Any compensation to be paid to Manager for services rendered after termination of this Agreement will be at the same rate of compensation, but will be subject to the prior approval of Owner.

(c) If this Agreement is terminated due to a sale of the Property by Owner, Owner agrees to pay Manager a bonus equal to the Management Fee paid to Manager for the last full calendar month of the term of this Agreement, as compensation to Manager for services rendered by Manager which are outside the scope of this Agreement and are occasioned by the sale of the Property. Manager shall submit an invoice to Owner for payment of this bonus at the same

time Manager submits to Owner the Monthly Report as required by paragraph 4(c) for the final month of the term of this Agreement.

4. **MANAGEMENT SERVICES.** Manager accepts its appointment and agrees to perform all services necessary for the care, protection and maintenance of the Property, including, but not limited to the following:

(a) Rental Payments, Determination of Rent Increases and Escalation Charges.

(i) Manager is responsible to collect all rentals and other monies due or to become due from the Property or its use or possession, provided that nothing herein contained shall constitute a guarantee by Manager of the payment of rent by any tenant. All rental payments shall be made payable to the name of the Property and not in the name of Owner or Manager. No second party checks shall be accepted by Manager and no checks shall be cashed as a courtesy to tenants. Checks with limiting endorsements shall only be deposited after Owner's approval for each and every such check.

(ii) Manager shall determine in a timely manner the amount of any rent increase or escalation charge covering base rent, security deposits, real estate/ad valorem taxes and operating expenses as provided for under any of the leases of the Property. Prior to submittal of any billings for such increases to any tenant, Manager shall submit to Owner for approval copies of proposed statements indicating the amounts and method of calculation for such increases. Upon receipt by Owner of such statements and any information necessary to verify the accuracy of such statements and the proportionate share due by such tenant, Owner shall have no less than fifteen (15) working days to review such statements before Manager is obligated under the provisions of the Tenant Leases to deliver same to tenants. If Manager submits incorrect statements to tenants or fails to deliver same to tenants in a timely manner, Owner shall have the right to deduct from the compensation due Manager hereunder as a penalty for such failure the amount of income lost due to Manager's failure to bill tenants properly. In no event shall the penalty exceed the amount due Manager as Monthly compensation hereunder. Notwithstanding the foregoing, if Manager's failure to deliver a statement to tenant in a timely manner is due to Owner's delay in approving same, provided such statement was received by Owner in a timely manner, or if an incorrect statement was approved by Owner in error and delivered to tenant, no such penalty shall be assessed against Manager. Prior to any deduction, Manager will be given reasonable opportunity to collect the income lost, however, such opportunity shall not exceed a period of sixty (60) days from the time that such lost income was discovered by either Manager or Owner. If Manager is able to recover such lost income from tenant, the amount of the penalty assessed to Manager shall be adjusted based upon the amount of such recovery.

(b) Records. Manager shall maintain complete and accurate records of all transactions relating to the Property and its supervision, management and operation, including, without limitation, invoices, receipts, bids, warranties, and all correspondence and data relating thereto; shall make such records available at any time for inspection by Owner and shall duplicate and remit copies thereof to Owner promptly upon request. Manager shall maintain the Property's records on a cash-basis using the Owner's prescribed Chart of Accounts except for property taxes and insurance costs and other significant expenses as approved by Owner. The originals of all records and all documents pertaining to the same shall be kept by Manager at the Property or at Manager's principal place of business and the originals of such records shall remain the property of Owner.

(c) Monthly Reports. Manager shall prepare monthly and forward to Owner at Manager's expense, for receipt by Owner on or before the tenth (10th) day of the succeeding month, a complete monthly accounting of all transactions relating to the Property, which accounting shall contain, in Owner's prescribed forms, the

P.10        WELLS FARGO        303 741 0867        05-13-1994 12:49

information set forth on Exhibit "A" attached hereto and incorporated herein by reference.

(d) **Other Reports.** Manager also shall provide to Owner described on Exhibit "B" attached hereto and incorporated herein by reference, which shall be prepared by Manager at the times indicated on Exhibit "B". In addition, Manager shall provide Owner as Owner may reasonably request from time to time, and shall comply promptly with such instructions as may be given to it by Owner.

(e) **Operating Budget.** Manager shall review the current budget for the Property no later than thirty (30) days from the commencement date of this Agreement and make recommendations to Owner regarding the same. In succeeding years, Manager shall submit to Owner by October 1st a pro-forma budget for the following fiscal year ending November 30th, in accordance with instructions that may be issued from time to time. On or before June 30th of each year Manager shall submit an updated forecast for the remaining months in such year and a preliminary budget for the following fiscal year. A written explanation of the budget shall accompany the pro-forma budget. Each proposed budget shall contain Manager's recommendations with respect to rental rates and discretionary expense items including, without limitation, advertising, capital improvements and on-site staffing including an updated Schedule in the form of Schedule H attached hereto. Owner shall review, revise as it believes necessary in its sole discretion, and Owner shall use its best efforts to approve in writing the final proposed budget to Owner (hereinafter described as the "Budget". In the event Manager does not receive such notice from Owner, then Manager shall place Owner on notice that Manager is operating under the subject budget which shall be deemed approved by Owner as of the first day of the related budget year until the date Owner notifies Manager of its disapproval. Thereafter, any changes in rents or any other discretionary or capital items set forth in the Budget, shall be made only with the prior written consent of Owner.

(f) **Management Functions.** The Manager, in addition to the above stated responsibilities, shall also provide services with the prior approval of Owner and at the expense of the Property, as follows:

(i) Coordinate with new tenants at the Property to facilitate their occupancy of their leased premises; provided, however, Manager shall not allow any new tenant to occupy any portion of the Property nor deliver to any new tenant keys allowing access to any portion of the Property without Owner's prior written approval unless Owner and the new tenant have both executed a lease or rental agreement providing for the proposed tenant's occupancy of such portion of the Property.

(ii) Perform and fulfill, on behalf of Owner, the obligations, covenants, agreements and promises of "Landlord" under all Tenant Leases of the Property or any part thereof;

(iii) Terminate tenancies and sign and serve such notices as are deemed necessary by Manager in conjunction with the approval of Owner and in accordance with the lease provisions and applicable laws; and

(iv) Supervise the persons or entities providing Customary Services pursuant to Paragraph 4(h) hereto.

(g) **Repairs and Maintenance.** Manager shall make or cause to be made and shall supervise all repairs, replacements, alterations, additions, improvements, decorations and maintenance (collectively, "Repairs") on the Property, including Repairs to any personal property located thereon in which Owner has an ownership or security interest, and shall purchase supplies and equipment for the maintenance and operation of the Property as it deems advisable or necessary. Any rebate or discount obtained by Manager for any of the foregoing expenditures shall become the property of Owner. Manager shall not make nor incur extraordinary expenditures for any

4

Repairs with respect to the Property without the prior approval of Owner except in those cases where, in the reasonable opinion of Manager, an emergency necessitates so doing before such approval can reasonably be obtained. In such cases, Manager shall report the same to Owner with all reasonable promptness. The term "extraordinary expenditures," as used in this paragraph, shall mean individual Repair or any group of related Repairs.

(b) Customary Services. Manager shall contract in the name of the Property or upon the prior written consent of Owner, in the name of Owner, and pay for all services which are customarily rendered in connection with the mere rental of real property with reference to the type of property involved and the area in which the Property is located (hereinafter referred to as "Customary Services"); provided, however, that (i) Manager shall receive the prior written consent of Owner, for all such contracts, (ii) all such contracts shall permit the cancellation thereof by Manager or Owner upon thirty (30) days' prior notice, and (iii) Manager shall obtain a minimum of three (3) competitive bids for all such contracts with a cumulative liability in excess of Two Thousand Dollars ($2,000) and shall submit all bids to Owner for review, together with Manager's recommendation with respect thereto. Manager shall use its best efforts to have all such contracts expire at the end of the fiscal year in order that they may be rebid annually in conjunction with the preparation of the Budget. Customary Services shall include such services as parking, management, security and guard service, janitorial maintenance, storage and warehousing services, snow removal, ground trash collection, elevator, sprinkler systems, and HVAC care, and other building and equipment repair services as required by the Property.

Owner is not permitted to obtain income from services to tenants which are not usually or customarily furnished or rendered in connection with the mere rental of real property, with reference to the type of property involved and the area in which the Property is located (hereinafter referred to as "Non-Customary Services"). Therefore, Manager shall submit to Owner for Owner's approval any services which Manager believes could be Non-Customary Services. Non-Customary Services will be provided by Manager only if approved by Owner in advance and in writing. Non-Customary Services would include, for example, maid service, car washing, or food delivery service. If such Non-Customary Services are approved by Owner, Manager shall not include in the amount paid as rent by the tenants of the Property any charge for Non-Customary Services, but must make a separate charge therefor, and the amount of such separate charge shall be received and retained by Manager.

Furthermore, Owner acknowledges that Manager will, from time to time, purchase consumer marketing, graphic design, computer aided architectural design, and other related design and print services from Info Graphics, Inc., a subsidiary of Manager. All such expenditures must be competitive and for design services used in leasing, marketing and promotion, and Owner's approval is subject to the approved Budget.

(1) Manager shall disclose to Owner any controlling ownership interest of Manager, any officer or employee of Manager, or any immediately family member (parent or parent-in-law, spouse, child, brother or sister, brother-in-law or sister-in-law, or step-parent) of an officer or employee of Manager in any corporation, partnership, joint venture or other business which provides materials, products, or services, directly or indirectly, for the Property. Such disclosure shall be made to Owner, in writing, at least ten (10) days prior to entering into any contract or agreement with such business for the provision of such products, materials or services.

(1) Insurance.

(1) Owner shall obtain the insurance coverages pertaining to the Property, including liability, elevator, boiler and machinery, property and D.I.C. coverages in amounts that are determined by Owner. Manager will be named as an additional

05-13-1994 12:51    303 741 1980    1980 741 1980    WELLS FARGO    P.12

insured on Owner's liability insurance policy for Manager's interests at the Property.

In support of the Owner's insurance, Manager is responsible for the following:

(i)   Manager shall notify Owner immediately of any fire or other casualty affecting the Property;

(ii)   Manager shall notify Owner in writing as soon as practicable after notice of an injury or claim is received;

(iii)   Manager shall cooperate completely with Owner and/or its insurers in the defense of such injury or claim;

(iv)   Manager shall provide Owner with a copy of any summons, subpoena, or other legal documents served upon Manager relating to the Property;

(v)   Manager shall take no steps (such as admission of liability) which will prejudice the defense or otherwise prevent Owner from protecting itself; and

(vi)   Manager is prohibited from settling any insurance claims which pertain to the Property without prior written consent of the Owner.

(2)   Manager at its own expense shall obtain the following insurance and provide Owner original Certificates of Insurance addressed to Owner evidencing this coverage prior to the execution of this contract. All insurance carriers used to provide this coverage must have a BEST rating of A - V or better.

(i)   Commercial General Liability insurance in the amount of not less than $1,000,000 per occurrence. Coverage is to include owned and non-owned vehicles, personal injury and contractual liability and provide to Owner and Manager a thirty (30) day prior notice of cancellation.

(ii)   Fidelity Bond (blanket position) in an amount not less than the total of three month's anticipated gross rents for the Property, insuring against acts of omissions, negligence, or dishonest acts of Manager or Manager's employees, contractors or agents. Such bond shall require that both Owner and Manager be notified in writing at least thirty (30) days prior to its cancellation. Not more frequently than once per year, if in the judgment of Owner the amount of such bond is insufficient, Manager shall increase the amount.

(iii)   Worker's Compensation and Employee liability insurance in compliance with requirements in the state where the Property is located.

(iv)   In the event that the Manager employs outside contractors to supply services for the operation and maintenance of the Property, it will be its responsibility to see that such contractors provide and maintain Commercial General liability insurance in the amount of $1,000,000 per occurrence, as well as Worker's Compensation insurance and that Owner and Manager are named as Additional Insured under the liability coverage.

(3)   If requested by Owner in writing, Manager shall, at Owner's expense, obtain any or all of the insurance necessary to protect the Property in amounts that are determined by Owner and from companies approved by Owner.

(j)   Government Rules. Manager shall advise Owner with respect to requirements for full compliance with all building codes, zoning and licensing requirements, and other laws, ordinances, regulations, orders and requirements of duly constituted federal, state and local governmental authorities having jurisdiction over the Property, and shall use its best efforts to cause the Property to fully comply with any such requirements. Manager may in its reasonable discretion oppose or appeal from any requirement it deems unwarranted and it may compromise or settle any dispute regarding such requirements; provided, however, that Manager shall have received the prior written consent of Owner for its intended action.

With respect to compliance with environmental laws, ordinances and regulations, Manager shall have a duty of reasonable inquiry and observation of any tenant's use, storage, treatment or disposal or emission or other discharge whatsoever of hazardous substances and toxic waste on or about the Property, whether or not such activities are or should be subject to federal, state or local

PDY(amah).wpd

permit requirements. Manager shall notify Owner immediately if it has a reasonable belief or actual knowledge of any such use, storage, treatment, emission or disposal whether or not such activities are or should be subject to federal, state or local permit requirements. At Owner's request, Manager shall request and obtain any tenant's hazardous materials inventory, licenses and permits.

(k)  **Employees.**  Manager shall have in its employ or cause to be employed by an entity under its direct control at all times a sufficient number of capable employees to enable it to maintain the Property properly, adequately, safely and economically. Manager will assign one person as the "Property Manager" for the Property. The Property Manager will have the primary responsibility for coordinating Manager's performance hereunder. The person assigned as the Property Manager may be changed from time to time in Manager's discretion, but Manager shall give Owner prior written notice of any such change, and any such change must be approved in writing by Owner. The assigned Property Manager shall be regularly available to supervise and coordinate the performance of Manager's responsibilities hereunder. The initial Property Manager shall be William A. Winburn, IV.

With funds from the Operating Account, Manager shall pay for the total compensation and related expenses of any of Manager's employees who are stationed at the Property (except that portion of such compensation and related expenses which are attributable to the furnishing of Non-Customary Services) if such compensation and related expenses are set forth in the Budget and on the attached schedule H as it may be amended from time to time. Such expense shall be evidenced to Owner by the presentation of invoices and supporting payroll records. Manager shall not be entitled to reimbursement in respect of the compensation and related expenses of any other of Manager's employees who perform work in connection with the Property including, without limitation, those involved in preparing the reports pursuant to paragraphs 4(c) and 4(d) hereof and the reports pursuant to paragraphs 4(e) hereof.

All matters pertaining to the employment of such employees are the responsibility of Manager, who shall be in all respects the employer of such employees and who shall fully comply with all applicable laws and regulations affecting the employer/employee relationship. Since this Agreement is not one of agency by Manager for Owner but one with Manager engaged independently in the business of managing properties on its own behalf, all employment arrangements are therefore solely Manager's concern; provided, however, that such employees or Manager shall be compensated at market rates for their services or under such other arrangement as shall be approved by Owner prior to the effectiveness thereof.

(l)  **Rules and Regulations.**  Manager proposes that any of its employees who are stationed at the Property perform work on matters not relating to the Property. Manager shall obtain the consent of Owner thereto as well as to the method of allocating the compensation of such employees between their work for the Property and such other work.

In the event Manager proposes that any of its employees who are stationed at the Property perform work on matters not relating to the Property, Manager shall obtain the consent of Owner thereto as well as to the method of allocating the compensation of such employees between their work for the Property and such other work.

(m)  **Hiring Attorneys.**  Manager shall, subject to Owner's prior written consent and at the expense of Owner, engage counsel to advise on legal matters and conduct legal proceedings arising in the performance of Manager's duties under paragraphs 4(f), 4(h), 4(i), 4(j), 4(k), and 4(n) hereof.

(n)  **Taxes and Assessments.**  Real estate taxes shall be paid directly by Owner. Manager shall verify with the applicable taxing authority that the payment by Owner of such real estate taxes has been received. Manager may be instructed by Owner to defend against, seek revision of, or appeal from any assessment or charge deemed improper, or pay any such charge or assessment under

7

protest and, if Owner has paid any such charge or assessment under protest, seek a refund thereof. Manager may, if it deems it advisable and with the prior consent of Owner, employ independent real estate experts acceptable to Owner for appraisals and testimony in connection with such actions.

(c) **Operating Account.**

(i) Manager shall promptly deposit all sums and monies collected for or on behalf of Owner (excluding Promotional Charges, as defined herein below) in an operating trust account (the "Operating Account"). Such account shall be separate from all other projects and Manager's personal and company account(s). Manager shall be responsible for all monies (cash, checks, money orders or otherwise) until such monies are deposited into the Operating Account.

Manager shall pay all expenses of the Property with independent signing authority on the Operating Account. The Manager should maintain a Fifty Thousand Dollars ($50,000) floor balance (the "Floor Balance") in its Operating Account to allow for unanticipated expenses.

On the tenth (10) day of each month and anytime requested by Owner, Manager shall wire transfer to an account designated by Owner the amount equal to (1) the balance in the Operating Account less the sum of (1) the anticipated expenses payable during such month and (2) the Floor Balance.

No more than twice monthly on the tenth (10th) and twentieth (20th) of each month, if the balance in the Operating Account is less than the sum of (1) the anticipated expenses payable during such month and (2) the Floor Balance, Manager shall request Owner to deposit additional funds into the Operating Account to cover such shortage. Manager's request for additional funds shall include the following: (1) current balance in Operating Account, (2) itemized list of anticipated expenses payable during such month, and (3) anticipated receipts which will be deposited in the Operating Account during such month. Within five (5) business days after Owner receives Manager's request for additional funds, Owner shall deposit in the Operating Account such amount as Owner determines in its sole but reasonable discretion is necessary to provide sufficient funds in the Operating Account for such month.

(ii) Manager shall promptly deposit all sums and monies collected for or on behalf of Owner representing promotional charges ("Promotional Charges") in an operating trust account (the "Promotional Charge Account"). Such account shall be separate from the Operating Account, all other projects and Manager's personal and company account(s). Manager shall be responsible for all monies (cash, checks, money orders or otherwise) until such monies are deposited into the Promotional Charge Account. Such account shall be separate from all other projects and Manager's personal and company accounts(s). Manager shall pay all expenses of the Property representing promotional charges with funds in the Promotional Charge Account. Both Manager and Owner shall have independent signing authority on the Promotional Charge Account.

(p) **Authorized Expenditures; Reimbursement.** The prudent expenditure by Manager out of funds deposited in the Operating Account is hereby authorized, subject to the following:

(i) Such authority may be modified at any time by Owner.

(ii) Salaries or other expenditures with respect to employees and others hired by Manager, whose duties are performed in or about the Property, which is attributable to the furnishing of Non-Customary Services are non-reimbursable by Owner.

(iii) All Repairs of any kind over Two Thousand Dollars ($2,000) and all non-recurring expenditures and non-budgeted items of any kind must be approved in advance by Owner, except for emergencies where immediate repairs are deemed necessary.

(iv) All costs for major Repairs, capital costs, lease commissions and tenant improvement costs shall be paid directly by Owner and not by Manager out of funds in the Operating Account.

funds in violation of the foregoing guidelines and restrictions shall not be reimbursed by Owner.

(q) **Other Services.** Manager shall perform such additional administrative and managerial services as follows, and other services as Owner may reasonably request:

(i) To contract for water, gas, electricity and other services, and utilities necessary for the maintenance and operation of the Property.

(ii) To meet with representatives of Owner, or others on a scheduled basis to review the operations of the Property, its budget for operation, and to spot-check the thoroughness of the servicing contractors.

(iii) For the purpose of bidding for various contracted services, investigate the competency and history of all potential bidders, and develop and submit detailed specifications for work to be performed, and conduct an analysis of bid results and provide recommendation to Owner for approval.

(iv) Continually inspect the Property and insure that all contract specifications are being properly administered, and complete a walk thru of the Property with specific contractors at least monthly.

(v) To initiate and maintain good tenant relations through personal contact on a regular basis, Manager should contact tenants a minimum of one time per quarter, or for tenants of 5,000 square feet or more, contact should be made a minimum of once per month.

(vi) To investigate and implement, with Owner's approval, energy saving measures to effect operational efficiencies and economies for the Property; and to provide for preventative maintenance measures for the major equipment and structural amenities of the Property.

(vii) To prepare and assist Owner in the development of long-range capital replacement requirements for the Property, on a 10 year projected basis.

(viii) To supervise and monitor tenant parking arrangements and utilization of parking spaces relative to allowances provided for in respective leases of the Property.

(ix) To utilize all appropriate property listing publications to reach the market and to achieve highest income levels allowable in the market place.

(x) To use all reasonable efforts to keep the Property rented by processing all new leases and by renegotiating existing Tenant Leases and negotiating the renewal of or the exercise of options to renew or expand existing Tenant Leases. Manager shall not execute any lease, nor shall Manager have the right to cancel or amend any lease without the written consent of Owner. Upon the execution by any existing tenant of any such renewal or expansion based upon negotiations by Manager, Owner agrees to pay a leasing commission to Manager as provided on Exhibit "C" attached hereto and incorporated herein by reference. Owner recognizes that in renegotiating existing Tenant Leases, Manager shall execute and require each tenant subject to a Tenant Lease to execute the Hold Harmless Agreement attached hereto as Exhibit D, and Manager agrees to furnish to Owner a duplicate original of such agreement at the time the same is executed in connection with such Tenant Lease.

(xi) To utilize the funds received from the Tenants for promotional events at the Property by booking such events, processing all contracts regarding such events, and managing such event as it occurs. Manager shall not execute any such contracts, nor shall Manager have the right to amend any such contract without the express consent of Owner.

(r) **Confidentiality.** Manager shall keep confidential all financial data pertaining to the Property and its operations ("Financial Data"), and any information received by Manager regarding the property located in Washington, D.C. generally known as the "Federal Triangle" which may be deemed confidential by the General Services Administration ("GSA Confidential Material"). In this regard, Manager shall not relate or distribute to any person

9

who is not an employee of Manager; (i) any Financial Data without the specific prior written approval of Owner, or (ii) any of the GSA Confidential Material. Manager shall require its employees, and such other persons to whom disclosure is permitted and made hereunder, to keep the data or information confidential to the same extent as is required of Manager hereunder. The provisions of the paragraph shall survive the termination of this Agreement for (i) five (5) years after such termination with respect to Financial Data and (ii) such period after such termination as may be required by the General Services Administration.

### 5. INDEMNIFICATION.

Manager hereby indemnifies Owner, and its respective representa-tives, shareholders, employees, trustees, officers, directors, partners, affiliates, employees and agents, from and against any and all claims, demand, liability, loss, cost, or expense, including in any way connected with any acts or omissions of Manager, its employees, agents, or contractors, which (A) are in breach of Manager's duties hereunder, (B) are outside the scope of Manager's authority or responsibility hereunder, (C) constitute negligence or willful misconduct, (D) constitute intentional torts, or (E) constitute negligence on the part of Owner, its employees, agents or contractors; provided, however, that Manager shall not be required to indemnify Owner to the extent that any otherwise indemnifiable costs under this section (E) are covered by the various insurance policies covering the Property and the liability of Owner and Manager. It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the indemnified parties. The foregoing provisions of this subparagraph shall survive the termination of this Agreement, but this shall not be construed to mean that Manager's liability survives as to any other provisions of this Agreement.

During the term of this Agreement, Owner hereby indem-nifies Manager and its representatives, shareholders, trustees, officers, directors, partners, affiliates, employees and agents, and shall defend and hold harmless Manager and its representatives, shareholders, trustees, officers, directors, partners, affiliates, employees and agents, from and against any and all claims, demand, liability, loss, cost, or expense, including without limitation, attorney's fees and expenses arising out of or connected in any way with the management and operation of the Property, Owner shall not be required to indemnify Manager for or defend or hold harmless Manager from any claims, actions or proceedings resulting from acts or omissions of Manager, its employees, agents or contractors, which (A) are in breach of Manager's duties hereunder, (B) are outside the scope of Manager's authority or responsibility hereunder, (C) constitute intentional torts or (B) constitute negligence on the part of Manager, its employees, agents or contractors, however, that Owner shall not be required to indemnify Manager to the extent that any otherwise indemnifiable costs under this section (E) are covered by the various insurance policies covering the Property and the liability of Owner and Manager. It is the intention of the parties that this indemnity does not require payment as a condition precedent to recovery by the indemnified parties. The foregoing provisions of this subparagraph shall survive the termination of this Agreement, but this shall not be construed to mean that Owner's liability survives as to any other provisions of this Agreement.

### 6. AMENDMENTS.

This Agreement may only be amended by the mutual written consent of Owner and Manager.

### 7. NOTICES AND CONSENTS.

Whenever referred to in this Agreement, any consents, approvals or notices of Owner or of Manager shall be given by at least one officer of Owner or one executive officer (i.e., president, vice president, secretary or treasurer) of Manager. Any consent, approval or notice required or

procmanall.wpd

permitted hereunder or by law to be given shall be considered as given upon the earlier of receipt by the party being sent such consent, approval or notice, or three days after the deposit in the United States mail, certified, return receipt requested, with postage prepaid, of said consent, approval or notice, addressed as follows:

To Owner:

    Collin Equities, Inc.
    c/o Wells Fargo Real Estate Group
    333 South Grand Avenue, 9th Floor
    Los Angeles, California 90071
    Attention: Manager, Legal Administration

With a copy to:

    c/o Wells Fargo Real Estate Group
    Regency Plaza One
    4643 So. Ulster Street
    Suite 1400
    Denver, Colorado 80237
    Attention: Manager, Special Properties

To Manager:

    Hill Partners, Inc.
    4500 Cameron Valley Parkway Suite 350
    Charlotte, North Carolina 28211
    Attention: J. Richard Hill

With a Copy to:

    Hill Partners, Inc.
    The Pavilion at the Old Post Office
    1100 Pennsylvania Avenue
    Washington, D.C. 20004
    Attention: General Manager

8. **NONASSIGNABILITY.** Owner has entered into this Agreement in reliance upon the experience and ability of Manager, and Manager shall not assign nor transfer this Agreement without the prior written consent of Owner. Owner's prior written consent shall not be unreasonably withheld provided that such assignment is to a subsidiary or affiliate company of Manager or any surviving corporation as a result of a merger by Manager and provided Manager's principals remain in control.

9. **APPLICABLE LAW.** This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

10. **ATTORNEYS' FEES.** If either party to this Agreement brings any judicial action or proceeding to enforce its rights hereunder, the prevailing party shall be entitled, in addition to any other remedy, to recover from the other party, regardless of whether such action or proceeding is prosecuted to judgment, all costs and expenses, including without limitation reasonable attorneys' fees, incurred therein by the prevailing party.

11. **WAIVER.** No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver in one instance be deemed to be a continuing waiver in any other instance.

12. **COMPETITION.** During the term of this Agreement, neither Manager nor any of Manager's affiliated entities shall engage in any specialty-retail property management activities within a three mile radius of the Property (unless Owner has otherwise provided written approval to Manager agreeing to such activities). For such period of time as may be established by the General Services Administration, neither Manager nor any of Manager's affiliated entities shall (i) engage in any management or leasing activities for the property located in Washington, D.C. generally known as the "Federal Triangle", (ii) own or control any retail premises or facilities in the Federal Triangle, or (iii) submit any proposal to lease or own such premises or facilities.

11

13. **STATUS OF MANAGER.** Nothing contained herein shall be deemed to create or shall be construed as creating in Manager an ownership interest in or to the Property. Notwithstanding anything to the contrary, which may be contained herein, Manager is and shall be construed for all purposes as an independent contractor and not an employee of Owner.

14. **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement and understanding of the parties hereto, and supersedes all prior agreements, negotiations, discussions and understandings relating to the subject matter hereof.

15. **BINDING EFFECT.** This Agreement shall be binding upon and inure to the Benefit of the parties hereto and subject to the provisions of paragraph 8 hereof, their respective successors and assigns.

16. **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

17. **SEVERANCE.** If any term, condition, covenant or agreement of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable, the remainder of such term, condition, covenant or agreement to persons or circumstances other than those to which it is held invalid, shall be unaffected thereby.

18. **LIMITATION OF LIABILITY.** Anything in this Agreement to the contrary notwithstanding, no representative, shareholder, trustee, officer, director, partner, affiliate, employee or agent of Owner shall be liable for any debt, claim, demand, judgment, decree, liability or obligation of any kind (in tort, contract, or otherwise) of, against or with respect to Owner arising out of any action taken or omitted for or on behalf of Owner under and pursuant to this Agreement, and Owner shall be solely liable therefor and resort shall be had solely to Owner's assets for the payment or performance thereof.

19. **OFFICE ON THE PROPERTY.** Manager may, with the prior consent of Owner, maintain and equip an office on the Property when, in its reasonable opinion, such a facility is necessary for the proper management of the Property, and so long as such facility is used by Manager exclusively in the performance or its management duties and responsibilities hereunder and for no other purpose whatsoever. The cost of furnishing and equipping such facility shall be borne by Owner. In the event Manager proposes to use such facility for purposes other than those relating exclusively to the Property, Manager shall obtain the consent of Owner thereto as well as to the method of allocating the expenses of such facility between the Property and such other purposes. Owner, in its sole discretion, upon five (5) days written notice, may terminate Manager's right to maintain and equip an office on the Property in which event, Manager shall immediately close its office on the Property and remove all property of Manager therefrom.

20. **NO DISCRIMINATION.** Neither Owner, Manager nor anyone authorized to act for either in the sale, provision of services, or any other manner shall discriminate against any person on the grounds of race, color, creed, religion, handicap, sex or national origin, and Manager hereby agrees to comply with all laws, regulations and ordinances pertaining thereto.

IF NOT EXECUTED BY MANAGER AND RETURNED TO OWNER ON OR BEFORE _____, 19__, THIS PROPERTY MANAGEMENT AGREEMENT SHALL BE NULL AND VOID AND NEITHER OWNER NOR MANAGER SHALL HAVE ANY RIGHTS OR OBLIGATIONS HEREUNDER. SUBMISSION OF THIS PROPERTY MANAGEMENT AGREEMENT FOR EXAMINATION, EVEN THOUGH EXECUTED BY MANAGER, SHALL NOT BIND OWNER IN ANY MANNER, AND NO AGREEMENT OR OTHER OBLIGATION

05-13-1994  12:57   303 741 0980   WELLS FARGO   P.19

ON THE PART OF OWNER SHALL ARISE, UNTIL THIS PROPERTY MANAGEMENT AGREEMENT IS EXECUTED AND DELIVERED BY OWNER TO MANAGER.

IN WITNESS WHEREOF, the parties hereto have affixed their respective signatures as of the day and year first above written.

Hill Partners, Inc.

By: _____
Its: Vice

By: _____
Its: CEO

"Manager"

Collin Equities, Inc. a Texas corporation

By _____
Vice President

By _____
Assistant Secretary

"Owner"

05-13-1994 12:58   303 741 0867   WELLS FARGO   P.20

pcp/consubill.wpd

05-13-94 02:40PM   P020 #21   303 741 0867   R=96%

EXHIBIT "A"
MONTHLY REPORT

Monthly Report to be delivered to Owner on or before the tenth
(10th) of each month with all information to have a cut-off date as
of the last working day of the prior month.

(1)  Balance Sheet;

(2)  Income Statement - Actual to Budget for current month and
     year-to-date and an actual year-by-month;

(3)  General Ledger;

(4)  Copy of Cash Receipts Journal by tenant which identifies how
     the receipt is to be allocated by account and for which
     period(s) and should agree to the total cash received per the
     bank reconciliation. The cash receipts cutoff date shall be
     the last working day of the month (see Schedule A);

(5)  Copy of Cash Disbursements Journal, utilizing the prescribed
     Owner Chart of Accounts. The Journal should allocate each
     disbursement by account and should agree to the total cash
     disbursed per the bank reconciliation. The cash disbursements
     cutoff date shall be the last working day of the month (see
     Schedule G);

(6)  Copy of bank statements. The bank statements' cutoff date
     shall be the last working day of the month.

(7)  Copy of bank reconciliations (see Schedule B);

(8)  Copy of invoice for Management Fee with analysis showing
     calculations of Management Fee included;

(9)  Copy of the Master Rent Roll (see Schedule C);

(10) Tenant Delinquency report which shall reflect all unpaid
     rents, expense recaptured, parking fees, storage fees, tenant
     receivables, late charges, and any other monies due as of the
     last working day of each month for the current as well as any
     prior periods (see Schedule D);

(11) Tenant Prepaid report (see Schedule E);

(12) One original and one copy of a month-end letter outlining
     accomplishments, setbacks, deviations from the budget, and
     comparisons to previous month's activity (as defined herein);

(13) Gross Sales report (if applicable) submitted by tenants
     pursuant to the terms of their lease;

(14) List of Collection Items received after the tenant has moved
     out and should include the date received and the amount
     received;

(15) Monthly Billback report which reflects the status of expense
     recapture collections. Billbacks are the periodic (other than
     monthly) billings to each tenant for their prorata share of
     expenses. This would be actual recapturable expenses incurred
     for the period being reconciled less amounts previously collected
     for the period less any expense stops and less amounts previously collected
     Billback report should provide detail to any billback amount
     listed under the "other" column of the Delinquency report;

EXHIBIT "A"

# EXHIBIT "B"
## OTHER REPORTS

1. Manager shall promptly, at month-end, submit a Leasing Renewal and Competition Report to Owner.

2. Tenant Delinquency report which shall reflect all unpaid rents, expense recaptured, parking fees, storage fees, tenant receivables, late charges, and any other monies due as of the fifteenth (15th) of each month for the current as well as any prior periods (See Schedule D). The report shall be delivered to Owner on or before the twentieth (20th) of each month.

3. Promptly following execution of this Agreement, promptly following any and all changes in on-site personnel and with each pro-forma budget submitted to Owner pursuant to para- graph 4(e) hereof, Manager shall prepare a Schedule of Compensation for Reimbursable Employees (See Schedule H) which shall include each employee's name, position, monthly salary or hourly wage, medical benefit expense, commission schedule (if any), total individual compensation, and total Property payroll.

4. At Owner's request, Manager shall submit to Owner all forms and brochures utilized for the Property, including but not limited to leases, tenancy agreements, deposit forms, paid deposit forms, inventory forms, and Property brochure and floor plans.

5. Promptly following execution of this Agreement and promptly following any and all additions, modifications or changes in such contracts, Manager shall provide Owner with copies of all service contracts relating to the Property, including utility company, scavenger, exterminator, landscape and any other service contractors. Such service Contracts shall be in the name of the Property but not in the name of the Owner.

6. Promptly following execution of this Agreement and at the times indicated below or upon request of Owner, Manager shall prepare the following items:

   a) Vertical or Horizontal Leasing Plan (March, June, Sep- tember and December)
   b) Asking Rent Schedule (When changes or quarterly)
   c) Building Standard Finish Schedule and Cost (not appli- cable if subject property completed)
   d) Tenant Improvement Allowance for new lease, existing renewal, or existing expansion.

7. Promptly following execution of this Agreement and promptly following any and all changes to the information reflected thereon, Manager shall submit to Owner a list of all of Manager's Subsidiaries and affiliates (See Schedule I).

8. Promptly following execution of this Agreement, Manager shall prepare and submit to Owner the following:

   a) A list of each Tenant's contact and notification addresses including Tenant's address for legal notices, billing address and address of the spaced leased in the Property;
   b) A lease abstract for each Tenant Lease with sixty (60) days from the commencement date of this Agreement;
   c) An inventory of Personal Property located on the Property and belonging to Owner;
   d) All phone numbers for phones on the Property, including, without limitation, any pay phones, elevator phones, and HVAC Computer phones; and
   e) A physical inspection report of the Property.

EXHIBIT "B"

EXHIBIT "C"

COMMISSION SCHEDULE

I. **Leasing Manager.** Owner and Manager hereby agree that Mr. John Pharr shall manage all leasing at the Property.

II. **Compensation to Manager.** Except as otherwise provided in Section III and IV below, Owner will pay to Manager in accordance with the terms of this Agreement a leasing commission in the amount which is the greater of: (a) Two Dollars ($2.00) per square foot of space ("Square Foot Rate") in the Premises (as defined in the lease); or (b) the amount of the Premises (as defined in the lease); or (b) the amount of the product of multiplying the Commission Rate (as hereinafter defined) times the Commission Basis (as hereinafter defined). Owner will also pay the amount of any sales tax payable on such commission, if applicable.

A. **Commission Rate.** The "Commission Rate" shall be equal to two and one-quarter percent (2-1/4%).

B. **Commission Basis.** The "Commission Basis" subject to the adjustments and exclusions defined below, shall be the total Base Rental (as hereinafter defined) due from the Tenant during the initial term of the Tenant Lease.

C. **Base Rental.** The "Base Rental", for purposes of calculating the Commission Basis shall be the aggregate, certain rental to be paid for space during the non-cancellable, non-contingent, lease term. Base rental does not include free rent periods and also does not include, by way of illustration only, such possible sources of revenue as:

1. Parking income;
2. Income generated under clauses providing for tenant participation in increased operating expenses;
3. Percentage rentals;
4. Payments for over-standard or after-hours building services;
5. Leasehold improvement costs (and interest thereon, if any) payable by tenant;
6. Late charges, cancellation, interest, or termination payments;
7. Rentals credited to Tenant or payments made to Tenant's prior landlord by reason of lease assumptions;
8. Rentals credited to Tenant by reason of below standard tenant improvements;
9. Moving and other allowances, including cash payments;
10. Rentals contingent on Tenant's failure to exercise cancellation or termination options, except as provided below;
11. Rentals contingent on Tenant's exercise of options to renew, extend, or expand; and
12. Additional rentals payable based on consumer price index or cost of living adjustments.

D. **Cancellation Options.** In the event a lease contains a cancellation or other clause allowing the tenant to terminate the lease prior to the expiration date, the base rental during the period from the earliest cancellation or termination date to the expiration date shall not be included in the Commission Basis, as stated above.

E. **Terms Exceeding Five Years.** Commissions payable for a lease with a term in excess of five (5) years or less than ten (10) years shall be equal to fifty (50%) percent of the commission stated above. Commissions payable for a lease with a term in excess of ten (10) years are considered to be individually negotiable and contingent upon approval by Owner.

F. **Month-to-Month Tenancy.** Commissions payable hereunder for any lease executed which is for a month-to-month tenancy or which provides Landlord or Tenant the option to terminate

the lease upon thirty (30) days notice shall be equal to the base rent paid by tenant to Owner in the first month of the lease.

G.    **Options to Extend, Renew or Expand.**  In the event a lease contains an option or options to renew, or an option or options to lease additional space, or a right or rights of first refusal for additional space, the rental contingent upon the tenant's exercise of any such option or right shall not be included in the Commission Basis as stated above.

III.  **Compensation with Co-Broker.**  For leases executed with the cooperation of another broker (including a broker who works for Manager who is not the Leasing Manager, exclusively representing a tenant or tenants) who is the procuring cause of a lease in the Property, in lieu of the Square Foot Rate and the Commission Rate defined hereinabove in Section II, those terms are deemed to mean and refer to:

(a) The Square Foot Rate shall mean and refer to Three Dollars ($3.00) per square foot of space in the Premises (as defined in the lease); or

(b) The Commission Rate shall mean and refer to three (3%) percent for any Tenant Lease whereby the square footage of the Premises is greater than 5,000 square feet ("Greater than 5,000 Lease"), or three and one-quarter (3-1/4%) for any Tenant Lease whereby the square footage of the Premises is less than 5,000 square feet ("less than 5,000 Lease").

Such commission shall be paid fifty (50%) percent to Manager and fifty (50%) to co-broker for a Greater than 5,000 Lease.  Such commission shall be paid forty-six (46%) to Manager and fifty-four (54%) to co-broker for a less than 5,000 Lease.

IV.  **Expenses.**  Owner has agreed to reimburse Hill Partners, Inc., ("Hill") pursuant to that certain Leasing Agreement between Hill and Owner related to the Property for certain Expenses, as that term is defined in the subject Leasing Agreement.  Owner shall, from time to time, be entitled to a credit against any commissions due to Manager hereunder until the maximum amount of credits which Owner is entitled to under the Leasing Agreement have been met.



EXHIBIT D

## Hold Harmless Agreement for – Shopping Center

This HOLD HARMLESS AGREEMENT made as of this _____ day of _____, 19__, by and between HILL PARTNERS, INC. (hereinafter called "HPI") and – _____ (hereinafter called "Tenant").

### WITNESSETH:

WHEREAS, HPI is the property manager and leasing agent for – (hereinafter called "Shopping Center") pursuant to a Management and Leasing Agreement (hereinafter called "Management Agreement") dated – by and between HPI and – (hereinafter called "Owner" or "Landlord").

WHEREAS, Landlord and Tenant have executed or are about to execute a lease agreement (hereinafter called "Lease"), whereby Tenant will lease space in the Shopping Center from Landlord.

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants herein contained, HPI and Tenant hereby agree as follows:

1. Tenant acknowledges (a) that HPI is an independent contractor acting solely within the scope of and pursuant to the terms of the Management Agreement, and (b) that HPI is not affiliated with the Owner nor does HPI have any ownership rights with respect to the Shopping Center.

2. HPI and Tenant acknowledge that no representations by HPI, understandings or agreements have been made or relied upon in the making of the Lease other than those set forth in the Lease, and the Lease contains all representations, understandings and agreements made with Tenant by HPI on behalf of Owner. No course of prior dealings between Tenant and HPI or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of the Lease.

3. Tenant agrees to look solely to Landlord for the satisfaction of any judgment obtained by Tenant against Landlord or the Shopping Center and shall hold and save HPI free and harmless from all expenses, claims, liabilities, losses, judgments or damages, including reasonable attorneys, fees, arising therefrom or directly or indirectly related thereto.

4. Tenant acknowledges that Owner is not a signatory to this agreement, but agrees that Owner can rely on the provisions of Section 2 hereinabove.

IN WITNESS WHEREOF, this Agreement has been executed as of the first day and year first above written.

HPI:

HILL PARTNERS, INC.

By: _____
    J. Richard Hill, President

TENANT:

By: _____
    , President

PROPERTY NAME
Cash Receipts as of MM-DD-YY

Schedule A

| Date Received | Suite No. | Tenant Name | Total Received | Base Rent | Overage Rent | Expense Recaptured | Parking/ Other | Explanation |
|---|---|---|---|---|---|---|---|---|
| MM/DD | 100 | ABC Systems | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| | | Total | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |

Schedule A

# BANK RECONCILIATION

Schedule B

BANK ACCOUNT NAME: _____

BANK NAME: _____  BANK ACCOUNT NO. _____

TYPE OF ACCOUNT: _____

MONTH ENDED: _____  GENERAL LEDGER ACCOUNT NO. _____

PREPARED BY: _____  DATE: _____

APPROVED BY: _____  DATE: _____

```
Balance Per Bank Statement  . . . . . . . . .              $
Add:    Deposits in Transit . . . (Section 1)
Deduct: Checks/Drafts Outstanding (Section 2)
Add (Deduct): Bank Errors . . . . (Section 3)
Adjusted Bank Balance . . . . . . . . . . . .              $

Balance Per Books (End of Prior Month)  . . .              $
Add:    Receipts (Current Month)  . . . . . .
Deduct: Disbursements (Current Month) . . . .
        Sub-Total . . . . . . . . . . . . . .              $
Add (Deduct): Miscellaneous Adjustments (Section 4)
Adjusted Book Balance . . . . . . . . . . . .              $
```

**DEPOSITS IN TRANSIT (Section 1)**

| Date | Amount | Description |
|------|--------|-------------|

**CHECKS/DRAFTS OUTSTANDING (Section 2)**

| Date | Check Number | Amount |
|------|--------------|--------|

**BANK ERRORS (Section 3)**

**MISCELLANEOUS ADJUSTMENTS (Section 4)**

| Date | Description/N.S.F. Re-Deposit Date | Amount |
|------|-----------------------------------|--------|



P.26    WELLS FARGO    303 741 0867    05-13-1994 13:01

PROPERTY NAME
Tenant Rent Roll as of MM-DD-YY

Schedule C

| Suite No. | Tenant Name | Sq. Ft. | Net Effective Rent/Sq.Ft. | Base Rent | Expense Recapture | Parking/ Other | Total Charged | Security Deposit Collected | Lease Commen. Date | Lease Expra. Date | Rent Start Date | Next Increase Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | ABC Systems | 000 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | MM/DD/YY | MM/DD/YY | MM/DD/YY | MM/DD/YY |
| Total | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | | | |

Schedule C

PROPERTY NAME

Tenant Delinquency Report as of MM/DD/YY

Schedule D

| TENANT NAME | HELD | DEL. | BALANCE | 1-30 | 31-60 | 61-90 | OVER 90 | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| BC Services | 1500.00 | RNT | 3000.00 | 1500.00 | | 1500.00 | | |
| | | TOT | 3000.00 | 1500.00 | | 1500.00 | | |
| | | | | | | | | |
| Z Systems | 0.00 | RNT | 2400.00 | | 800.00 | 800.00 | 800.00 | |
| | | CAM | 600.00 | | 200.00 | 200.00 | 200.00 | |
| | | LAT | 300.00 | | 100.00 | 100.00 | 100.00 | |
| | | ESC | 333.33 | | 333.33 | | | |
| | | TOT | 3633.33 | 0.00 | 1433.33 | 1100.00 | 1100.00 | |
| | | | | | | | | |
| PROPERTY TOTALS | | | 6633.33 | 1500.00 | 1433.33 | 2600.00 | 1100.00 | |

DEL:

  Base Rent Billing
  Quarterly Expense Billing
  Rental Tax
  Monthly Billing
  Charges
  Tax Billback
  Late Billback
  Expense Escalation Billback

Schedule D

05-13-1994  13:25    303  741  0867    WELLS FARGO    P.02

PROPERTY NAME

Tenant Prepaid Report as of MM-DD-YY

Schedule E

| Suite No. | Tenant Name | Total Rec'd | Base Rent | Expense Recapture | Other | Explanation |
|---|---|---|---|---|---|---|
| 100 | ABC Systems | $0.00 | $0.00 | $0.00 | $0.00 | |
| Total | | $0.00 | $0.00 | $0.00 | $0.00 | |

Schedule E

PROPERTY NAME
Tenant Billback Report as of MM-DD-YY

Schedule F

| Suite No. | Tenant Name | Current Year | | Prior Year | | Comments |
|---|---|---|---|---|---|---|
| | | Amount Billed | Amount Owing | Amount Billed | Amount Owing | |
| 100 | ABC Systems | $0.00 | $0.00 | $0.00 | $0.00 | |
| | Total | $0.00 | $0.00 | $0.00 | $0.00 | |

Schedule F

PROPERTY NAME
Cash Disbursements as of MK-DD-YY

Schedule G

| Check Date | Check No. | Payee | Check Amount | Acct. # Title | Acct. # Title | Acct. # Title | Acct. # Title | Acct. # Title | Acct. # Title | Acct. # Title |
|---|---|---|---|---|---|---|---|---|---|---|
| KK/DD | 1001 | Assoc. Building Services | $0.00 | | | | | | | |
| Total | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Schedule G

Project: _____                    SCHEDULE H
_____ square feet
                                                     Schedule of Compensation
                                                     For Reimbursable Employees

                                                     2/1/90

| | Employee Title | Number With Title | Full Time or Part Time (1) | Present Base Wage Per Hour or Month (2) | Benefits and Fees Paid By Owner (3) | Anticipated Bonus (If Applicable) | Leasing Incentive (4) | Monthly Value of Housing Allowance (5) | Is Employee Covered by Fidelity Bond? |
|---|---|---|---|---|---|---|---|---|---|

I.   On Site:


II.  Off Site: (6)

III. Other Questions:

A.   Is this a full staff?  If not, please explain. _____

B.   Are any others given apartment or discounts on apartments in return for services (i.e., policeman, maids, etc.)?
     If not, please explain. _____
     _____

C.   Does information contained on this form include wages and reimbursable expenses of all individuals for this project?
     If not, please explain. _____
     _____

(1)  Please indicate what percentage of week is worked.
(2)  If hourly, please indicate rate per hour.  If monthly, indicate such.
(3)  Health Ins., Disability Ins., Retirement, Workman's Comp., etc.:  indicate amount and type of each, as well as cost to owner.
(4)  Please explain how leasing incentive program works.
(5)  Based upon current market apartment rents.
(6)  Off-site means individuals who work at an office not on the property.

                                   Schedule H

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHERRY KILGORE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HILL PARTNERS | ) |
| CORPORATION, INC., | ) |
| et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 08-0974

## ORDER

_____Upon consideration of Defendant's Motion to Dismiss , the supporting memorandum of points and authorities, Plaintiff's Opposition thereto, Defendant's Reply, and the entire record herein, it is this _____ day of _____, 2008,

ORDERED, that for the reasons stated in Defendant's memorandum of points and authorities and Reply, Defendant's motion be, and hereby is, GRANTED, and it is further,

ORDERED, that Plaintiff's Complaint be, and hereby is, DISMISSED with prejudice against the United States.

_____
United States District Court Judge